IN THE UNITED STATES DISTRICTCOURT
FOR THE DISTRICT OF WEST VIRGINIA

**MICHAEL PATRICK GIAMBALVO,**

    **Plaintiff,**

    **v.**                      **Civil Action No. 1:11cv14**
                                           **(Judge Keeley)**

**UNITED STATES OF AMERICA,**

    **Defendant.**

## REPORT AND RECOMMENDATION

On February 10, 2011, the *pro se* plaintiff, Michael Patrick Giambalvo ("Giambalvo"), filed this action pursuant the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, et seq. With his complaint, Giambalvo also filed a motion to proceed in *forma pauperis* ("IFP") and a motion to appoint counsel. On March 1, 2011, Giambalvo was granted IFP status. On March 21, 2011, he paid the initial partial filing fee. By Order entered on March 23, 2011, plaintiff's motion for appointed counsel was denied. On May 19, 2011, plaintiff filed a "Notice of Fault: Pre Suit Notice, In Compliance with Code §55-7b-6(c) West Virginia." On June 8, 2011, plaintiff filed a second motion for appointed counsel, and on June 10, 2011, he filed a supplement to his original complaint.

On July 8, 2011, the undersigned made a preliminary review of this matter and determined that summary dismissal was not warranted. Accordingly, the Clerk was directed to issue a 60 day summonses and serve the defendant, the United States Attorney's Office for the Northern District of West Virginia and the Attorney General for the United States of America. The plaintiff's second motion for appointed counsel was denied by Order entered on July 13, 2011. After its September 8, 2011 motion for an extension of time in which to respond was granted by Order entered September 9, 2011, the Government filed a Motion to Dismiss with a memorandum in support on October 25, 2011. On October 26, 2011, a Roseboro Notice was issued. The plaintiff filed a motion for an extension of time in which to reply on November 4, 2011, which was granted by Order entered on

November 8, 2011. By Order entered on November 16, 2011, the defendant was directed to provide a supplemental response. On November 30, 2011, the defendant filed its supplemental response. On December 8, 2011, the plaintiff replied, and also filed an objection in part to defendant's supplemental response, along with a memorandum in support of opposition to the defendant's motion to dismiss. The defendant responded on December 21, 2011.

This matter is now pending before me for a Report and Recommendation.

## I. Statement of Facts

Plaintiff is currently incarcerated at Butner Federal Medical Center, located in Butner, North Carolina. On November 30, 2007, while incarcerated U.S.P. Hazelton in Bruceton Mills, West Virginia, the plaintiff sought treatment from the Health Services Department at the prison for an ingrown toenail on the fourth toe of his right foot. Plaintiff contends that a physician's assistant ("P.A.") Michael Azumah ("Azumah"), after making him sign a blank authorization for what he was told would merely be an injection of local anesthetic, and without first obtaining informed consent, removed the entire toenail by pulling it out by its root. Afterwards, he alleges that Azumah wrapped his toe in a dressing so tight that it completely blocked its circulation, causing a restriction in blood supply, resulting in permanent damage to his toe and ultimately, to his right foot. Since that time, Giambalvo alleges he has developed multiple complications, suffered extreme pain and suffering, been denied timely and appropriate medical treatment, and has sustained permanent and disabling injury and need for further care.

The plaintiff exhausted his administrative remedies before filing the instant complaint pursuant to the Federal Tort Claim Act complaint on February 10, 2011.

## II. The Complaint and Plaintiff's Supplement to the Complaint

The plaintiff raises numerous medical negligence claims, reorganized and condensed here for clarity and to avoid duplicity, alleging that:

1) there was lack of informed consent for the November 30, 2007 removal of his right 4th toenail at U.S.P. Hazelton.

2) U.S.P. Hazelton's physician's assistant Michael Azumah performed an unnecessary medical procedure when he removed the plaintiff's entire right 4th toenail on November 30, 2007;

3) Michael Azumah altered or changed the medical record after performing the procedure to make it appear that the plaintiff gave informed consent to the procedure when such was not the case.

4) U.S.P. Hazelton permits practitioners who lack current privileges, practice agreements, protocols and qualifications to perform surgical procedures and provide post-operative care to inmates at the prison.

5) He was denied emergency medical treatment by U.S.P. Hazelton's Health Services Department on December 1, 2007, which, had it been timely provided, would have more likely than not avoided the serious and permanent injury he is left with today;

6) the medical personnel at USP Hazelton's Health Services were negligent; failed to fully document his symptoms; were not truthful or forthcoming in response to direct inquiries from BOP officials; failed to provide complete and accurate information, including copies of medical records to plaintiff and his subsequent medical providers; altered and/or concealed medical records; failed to appreciate the severity of his symptoms, his condition and the significance of test results; failed to timely diagnose the complications that ensued from the November 30, 2007 procedure; failed to prescribe appropriate medications to avoid injury to his stomach and liver; and delayed providing appropriate and timely needed medical care, permitting his condition to worsen, causing needless pain, suffering and resulting in permanent and disabling injuries.

7) Plaintiff avers that the defendant has retaliated against him and/or made threats to him as a result of his continued pursuit of his claims.

8) Because of the negligence of the B.O.P.'s Health Services Department, plaintiff is likely to have further problems with his back and with ambulation in the future, as a direct result of the denial of appropriate care which causes him to hop around on one foot to avoid bearing weight on the other.

9) He has been denied the actual treatment needed to repair the injury, or the surgery necessary to relieve him of severe and continuing pain from his injury.

Plaintiff specifically alleges he was thirty-eight years old, fully ambulatory and in fairly good health at the time he underwent the November 30, 2007 procedure and suffered an injury to his right 4th toe as a result of the 48 hour-period of restricted blood flow from the excessively tight bandage. He avers he has since suffered skin breakdown, pain, swelling, tissue death and skin necrosis to his toe as a result. He further avers he subsequently developed a Methicillin-Resistant Staphylococcus Aureus ("MRSA") infection in the open wound, which was inadequately treated until it spread to the

bones in his foot, causing osteomyelitis, inflammation and permanent nerve damage. He is now left with chronic, severe neuropathic pain, is unable to bear weight on his right foot, is confined to a wheelchair and/or relegated to the use of a walker and/or cane to ambulate; requires custom-fit specialized "rocker-bottom" medical walking shoes and custom fit orthotics; and is facing possible amputation of the fourth toe on his right foot or surgery to sever and/or resect the nerves of the foot. He requires a treatment team which includes, but is not limited to, a primary care physician treatment team, neurologist, orthopedic and physical therapy staff, a psychiatrist[1] and a pain management provider, has had a battery of blood tests, multiple nerve injections with little relief, and numerous radiological studies. He alleges that he has suffered and will continue to suffer mental and emotional distress, extreme pain, suffering, and humiliation in the future, requiring psychological therapy and treatment.

As relief, he requests injunctive relief, enjoining the defendant to provide him regular semi-annual podiatric evaluations; monetary damages of one million dollars ($1,000,000.00); reimbursement for the cost of suit; post-judgment interest; and any other relief the Court deems proper.

### III. The Defendant's Motion to Dismiss and Supplement

In response, the defendant moves the Court for an order dismissing the plaintiff's medical negligence and medical malpractice complaint for failing to state a claim upon which relief could be granted, on the grounds that plaintiff plaintiff's claims fail because he has not alleged facts sufficient to establish a breach of the duty by the Bureau's medical staff failed to submit a screening certificate of merit with his complaint or within thirty days before its filing, pursuant to W.Va. Code §55-7B-3(a). The defendant contests plaintiff's invoking the doctrine of *res ipsa loquitor* to excuse his failure to do so, contending that *res ipsa loquitor* is not applicable under the circumstances here.

---

[1] Plaintiff, desperate when his pain medications were discontinued by his PCP at some point during 2010, apparently attempted suicide by hanging. (Dkt.# 14-3 at 1-2 and Dkt.# 1-7 at 2-3).

The defendant's supplemental response concedes that the plaintiff has exhausted his administrative remedies with regard to his claims, and has timely filed his complaint.

**IV. The Plaintiff's  Memorandum of Law in Support of Plaintiff's Affirmation in Opposition to Motion and Plaintiff's Reply**

Plaintiff urges that defendant's motion to dismiss be denied.   He contests defendant's assertion that his complaint should be dismissed because he failed to submit a Screening Certificate of Merit, noting that attached to his complaint was his notice of claim titled "In Lieu of Medical Screening Certificate of Merit.   W.Va. Code §55-7b-6(c), in which he made it clear that he was invoking the doctrine of *res ipsa loquitor* to support his claim and provide the requisite medical opinion.   He argues that a screening certificate is not required because the facts of his claim, an excessively tight bandage preventing blood flow, necrosis and infection are  "non-complex matters of diagnosis and treatment within the understanding of lay jurors by resort to common knowledge and experience, so that expert testimony is not required on the accepted standard of care." (Dkt.# 52 at 2). Plaintiff avers that, pursuant to the holding in <u>Johnson v. United States</u>, 394 F.Supp.2d 854, 858 (S.D. W. Va. 2005), expert testimony may not be required, because defendant received ample pre-suit notice of his claim via his administrative grievances filed before he filed his instant complaint. He asserts that his verified complaint with all its attached exhibits, including his medical records and the "In Lieu of Medical Screening Certificate of Merit" (Dkt.# 1-5 at 1-3) meet the requirements of W.Va. Code 55-7b-6(c).

**V.   The Defendant's Response to the Plaintiff's Reply**

The defendant vigorously reiterates its position that the plaintiff has not complied with the MPLA by providing pre-suit notice of his claim, pointing out that plaintiff's alleged "pre-suit" notice sent to the BOP and the U.S. Attorney's Office on April 18, 2011, were in fact sent over two months after suit had already been filed.

**VI. Plaintiff's Reply to the Defendant's Response to his Reply**

Plaintiff generally reiterates his position and attempts to refute the defendant's arguments on the same.

## VII.  Standard of Review

### A.  Motion to Dismiss

In ruling on a motion to dismiss the Court must accept as true all well-pleaded factual allegations.  Walker v. True, 399 F.3d 315 (4th Cir. 2005).  Furthermore, dismissal for failure to state a claim is properly granted where, assuming the facts alleged in the complaint to be true, and construing the allegations in the light most favorable to the plaintiff, it is clear, as a matter of law, that no relief could be granted under any set of facts that could be proved consistent with the allegations of the complaint.  Hishon v. King & Spaulding, 467 U.S. 69, 73 (1984); Conley v. Gibson, 355 U.S. 41, 4506 (1957).

Further, the Court is required to hold a *pro se* pleading to a less stringent standard than those drafted by attorneys, Gordon v. Leeke, 574 F.2d 11447, 1151 (4th Cir. 1978), and must liberally construe complaints filed by *pro se* litigants, to permit the development of a potentially meritorious case.  Hughes v. Rowe, 449 U.S. 5, 9 (1980).

## VIII.  Discussion

The Federal Tort Claims Act (FTCA) is a comprehensive legislative scheme by which the United States has waived its sovereign immunity to allow civil suits for actions arising out of negligent acts of agents of the United States acting within the scope of their employment.  The United States cannot be sued in a tort action unless it is clear that Congress has waived the government's sovereign immunity and authorized suit under the FTCA.  Dalehite v. United States, 346 U.S. 15, 30-31 (1953). The provisions of the FTCA are found in Title 28 of the United States Code.  28 U.S.C. § 1346(b), § 1402(b), § 2401(b), and §§ 2671-2680.

Pursuant to the FTCA, the United States is liable in the same manner and to the same extent as a private individual under like circumstances in accordance with the law of the place where the act

or omission occurred. 28 U.S.C. §§ 2674 and 1346(b)(1); Medina v. United States, 259 F.23d 220, 223 (4th Cir. 2001). In West Virginia, in every action for damages resulting from injuries to the plaintiff alleged to have been inflicted by the negligence of the defendant, the plaintiff must establish three elements: (1) a duty which the defendant owes to him; (2) a negligent breach of that duty; and (3) injuries received thereby, resulting proximately from the breach of that duty. Webb v. Brown & Williamson Tobacco Co., 2 S.E.2d 898, 899 (W.Va. 1939). In a claim against the United States under the FTCA, the law of the place "where the act or omission occurred" must be applied. 28 U.S.C. § 1346(b)(1); Cibula v. United States, 551 F.3d 316, 319 (4th Cir. 2009). The "acts or omissions" complained of in this case occurred in West Virginia; therefore, West Virginia law applies.

The singular issue presented by the defendant's Motion to Dismiss is whether plaintiff has complied with the requirements of West Virginia Code section 55-7B-6. Some judges have ruled that this requirement is substantive, rather than procedural. See Griffin v. Rubenstein, 2009 WL 1587274 at *2 (S.D. W. Va. June 8, 2009) ("[C]ompliance with West Virginia Code § 55-7B-6 is mandatory prior to filing suit in federal court."); Stanley v. United States, 321 F.Supp.2d 805, 806-07 (N.D. W. Va. 2004) (ruling that section 55-7B-6 is substantive, rather than procedural). The undersigned concludes that the plaintiff has complied with that statute. Therefore, there is no need to determine whether it is substantive or procedural.

Subsection (b) of section 55-7B-6 requires a plaintiff in a medical-malpractice action to serve all health-care-provider defendants with a "notice of claim" at least thirty days prior to filing a medical-malpractice lawsuit. W. Va. Code § 55-7B-6(b). The notice of claim must include "a statement of the theory or theories of liability upon which a cause of action may be based, and a list of all health care providers and health care facilities to whom notices of claim are being sent, together with a screening certificate of merit." Id. The certificate of merit must be executed under oath by a qualified medical expert and must state: "(1) The expert's familiarity with the applicable

standard of care in issue; (2) the expert's qualifications; (3) the expert's opinion as to how the applicable standard of care was breached; and (4) the expert's opinion as to how the breach of the applicable standard of care resulted in injury or death." Id.

Subsection (c) of Section 55-7B-6, however, provides that if a claimant "believes that no screening certificate of merit is necessary because the cause of action is based upon a well-established legal theory of liability which does not require expert testimony supporting a breach of the applicable standard of care," then the claimant "shall file a statement specifically setting forth the basis of the alleged liability of the health care provider in lieu of a screening certificate of merit." Id. 55-7B-6(c).

The defendant contends that the plaintiff has failed to comply with the requirements of §55-7B-6, arguing that a certificate of merit is required because "[p]laintiff's numerous and complex allegations of medical negligence are such that require expert testimony supporting or refuting a breach of the applicable standard of care." (Dkt.# 49 at 2). The defendant contends that the facts of plaintiff's case are such that an inference of negligence based on a common sense understanding of the lack of care or want of skill is not so gross as to be apparent, nor do they relate to matters of diagnosis and treatment within the understanding of lay jurors. (Id. at 5.) Furthermore, the defendant maintains that even if a screening certificate of merit is not required, "the facts as alleged by Plaintiff . . . fail to establish a breach of the duty by the Bureau's medical staff. Moreover, the resulting injury . . . cannot be said to have been the direct result of any breach of that duty without the explanation of expert testimony." (Id. at 7). Therefore, the defendant contends, because the plaintiff has not complied with §55-7B-6(b), the complaint should be dismissed.

The plaintiff rejects this argument, contending that he has complied with the §55-7B-6's requirements. He first contends that a screening certificate was not required because the facts of his claim, an excessively tight bandage preventing blood flow, necrosis and infection are "non-complex matters of diagnosis and treatment within the understanding of lay jurors by resort to common

knowledge and experience, so that expert testimony is not required on the accepted standard of care." (Dkt.# 52 at 2). He reiterates that defendant received pre-suit notice of his medical negligence claims in the administrative grievances he filed before filing suit. He asserts that his verified complaint with all its attached exhibits, including his attachment "In Lieu of Medical Screening Certificate of Merit" (Dkt.# 1-5 at 1-3) meet the requirements of W.Va. Code 55-7b-6(c).[2]

## A. **A screening certificate of merit is not required**

Section 55-7B-6(c) excuses a plaintiff from complying with subsection (b) if the claimant or his counsel believes that expert testimony will be unnecessary. Viewing the facts in the light most favorable to the plaintiffs, see Johnson v. United States, 394 F.Supp.2d 854, 858 (S.D. W. Va. 2005), expert testimony may not be required. The plaintiff's many administrative grievances filed before filing suit, his complaint with its attachments and his attached "In Lieu of a Screening Certificate of Merit" all clearly allege that Michael Azumah, P.A. applied a dressing to his toe so tightly that it in effect, functioned as a tourniquet, cutting off circulation to the toe. He alleges that Azumah instructed him not to remove the bandage, gave him a rubber glove to place over it in the shower, and told him to report to Health Services on Monday, December 3rd, 2007. (Dkt.# 1-1 at 1, , ¶ 26). Because of his extreme pain, plaintiff sought to return to Health Services the following day but was refused. He finally managed to be seen on December 2nd, 2007, twenty-four hours before he contends Azumah instructed him to return. By that time, forty-eight hours after the dressing had been applied, the toe had no blood flow and was black. Although fairly complex medical terms are used within the complaint and attached records, it is possible that a jury may not require an expert to explain that the alleged conduct breached the applicable standard of care. As such, a screening certificate is not required under section 55-7B-6.

---

[2] Although plaintiff's "notice of claim" was not executed under oath by a health care provider qualified as an expert under the West Virginia rules of evidence, it was a statement that specifically set forth, albeit tersely and in layman's language, the basis of the alleged liability of the health care providers in lieu of a screening certificate of merit. Plaintiff identified the medical provider, Michael Azumah, and explained that Azumah had wrapped the dressing so tightly around his right fourth toe that he had caused permanent injury.

**B. The plaintiff complied with section 55-7B-6(c)**

The Supreme Court of Appeals of West Virginia has recognized that "the Legislature's clear intent in enacting W.Va. Code § 55-7B-6 was to mandate that a plaintiff in a medical malpractice claim file his or her certificate of merit at least 30 days prior to filing his or her medical malpractice action so as to allow health care providers the opportunity to demand pre-litigation mediation." Miller v. Stone, 607 S.E.2d 485, 490 (W. Va. 2004). Subsection (c) of that statute requires the claimant to provide each putative defendant with a statement of a "well-established legal theory of liability which does not require expert testimony supporting a breach of the applicable standard of care."

Attached to plaintiff's complaint were a number of medical records, *inter alia,* a July 6, 2010 "Administrative Note" by an orthopedic surgeon at FCI Butner (Low), by the name of Reginald Hall, MD stating, in pertinent part:

> **Since the inmates [sic] visit I have been asked by several people about the diagnosis, cause and treatment of the inmates [sic] problem and whether it was caused by tx[3] [sic] in the BOP. I have reviewed what records are available to me. Unfortunately, I was unable to find the records by the providers that did the procedure on his toe. I only have reports from the inmate and what other consultants have described. Without this, it would only be conjecture on my part as to whether anything was done wrong. It is certainly possible to injure the nerve(s) with a tourniquet [sic] or dressing that is extremely tight (if it were left on for a long time). It is also possible to cause skin necrosis which he apparently had. The combination of this and inflammation/infection may have been enough to initiated CRPS-non sympathetically mediated**. RSD[4] has been

---

[3] "Tx" is a medical abbreviation for 'treatment." See http://www.scribd.com/doc/8723349/Medical-Abbreviations-Glossary at 14.

[4] Reflex Sympathetic Dystrophy ("RSD") is a chronic pain condition that is believed to be the result of dysfunction in the central or peripheral nervous systems. RSD involves "irritation and abnormal excitation of nervous tissue, leading to abnormal impulses along nerves that affect blood vessels and skin." Animal studies indicate that norepinephrine, a catecholamine released from sympathetic nerves, acquires the capacity to activate pain pathways after tissue or nerve injury, resulting in RSD. Another theory suggests RSD which follows an injury is caused by triggering an immune response and symptoms associated with inflammation (redness, warmth, swelling). RSD is not thought to have a single cause, but rather multiple causes producing similar symptoms. RSD usually affects one of the extremities (arms, legs, hands, or feet). The primary symptom of RSD is intense, continuous pain. According to NINDS, the list of symptoms includes: burning pain, increased skin sensitivity, skin temperature changes (warmer or cooler than opposing extremity), skin color changes (blotchy, purple, pale, red), skin texture changes (shiny, thin, sweaty), changes in nail and hair growth patterns, stiffness and swelling in affected joints, and decreased ability to move affected extremity. Pain can spread to a

mentioned several times in the record. I don't think he has a classic RSD but can't r/o[5] [sic] a chronic regional pain syndrome[6] (CRPS) that is sympathetically mediated. This can be triggered by relatively insignificant traumatic events. It has been my experience that these patients are seldom cured with surgery and gains may be marginal. I am not aware of any diagnostic test for RSD/Chronic Regional Pain Syndrome (CRPS) that is sympathetically mediated other than a sympathetic block which is only helpful if it gets rid of all his pain and in my experience is only helpful very early on in the process. His bone scan and clinical exam don't seem consistent with this diagnosis but doesn't r/o [sic] CRPS non sympathetically mediated. Amputation has been mentioned as an option however it has been my experience that this is not curative and it can be difficult to handle both nerve stumps to that they are not a source of continued pain. I need to talk with several medical providers before proceeding any further.

(Dkt.# 14-3 at 1-2 and Dkt.# 1-7 at 3) (emphasis added).

In <u>Johnson v. United States</u>, 394 F.Supp.2d 854, 858 (S.D.W.Va. 2005), the Court held that plaintiff's statement on his Standard Form 95 (SF-95) administrative claim, alleging that a doctor and other agents and employees of a Veterans Administration medical center improperly surgically implanted a prosthesis satisfied the provisions of the MPLA, permitting the filing of a claim without submitting a certificate of merit. The Court reasoned that plaintiff's claim was based upon a well-established legal theory of liability and expert testimony was not required to show a breach of the standard of care because plaintiff stated on his form that the surgeon implanted a penile prosthesis

---

wider area (i.e. from finger to entire arm) and can spread to the opposite extremity (i.e. from left arm to right arm). Emotional stress can cause symptoms to worsen. See http://arthritis.about.com/od/rsd/a/rsd.htm

[5] "R/O" is a medical abbreviation for "rule out." See http://www.scribd.com/doc/8723349/Medical-Abbreviations-Glossary at 12.

[6] Chronic Regional Pain Syndrome ("CRPS") is a chronic pain condition. The key symptom of CRPS is continuous, intense pain out of proportion to the severity of the injury, which gets worse rather than better over time. CRPS most often affects one of the arms, legs, hands, or feet. Often the pain spreads to include the entire arm or leg. Typical features include dramatic changes in the color and temperature of the skin over the affected limb or body part, accompanied by intense burning pain, skin sensitivity, sweating, and swelling. Doctors aren't sure what causes CRPS. In some cases the sympathetic nervous system plays an important role in sustaining the pain. Another theory is that CRPS is caused by a triggering of the immune response, which leads to the characteristic inflammatory symptoms of redness, warmth, and swelling in the affected area. Because there is no cure for CRPS, treatment is aimed at relieving painful symptoms. Doctors may prescribe topical analgesics, antidepressants, corticosteroids, and opioids to relieve pain. However, no single drug or combination of drugs has produced consistent long-lasting improvement in symptoms. Other treatments may include physical therapy, sympathetic nerve block, spinal cord stimulation, and intrathecal drug pumps to deliver opioids and local anesthetic agents via the spinal cord. The prognosis for CRPS varies from person to person. Spontaneous remission from symptoms occurs in certain individuals. Others can have unremitting pain and crippling, irreversible changes in spite of treatment. See http://www.ninds.nih.gov/disorders/reflex_sympathetic_dystrophy/reflex_sympathetic_dystrophy.htm

that was not only too large, but was also implanted backward, causing diminished blood flow and subsequent necrosis and infection. Id.

Here, defendant concedes that plaintiff has fully exhausted his administrative remedies. (Dkt.# 49 at 1). Contrary to the defendant's assertions that it had no pre-suit notice of plaintiff's claims, the plaintiff, like that in Johnson, *supra,* has complied with the requirements of the MPLA by repeatedly laying out in specific detail his pre-suit legal theory of liability within his multiple levels of administrative grievances filed over the three years before he filed his instant complaint pursuant to the Federal Tort Claim Act, beginning with his first request for an informal resolution on January 29, 2008.[7] (Dkt.# 1-6 at 15). Moreover, his complaint and its attachments, especially the Administrative Note by Dr. Reginald Hall, clearly provides a physician's opinion as to the details of plaintiff's injuries and the likely mechanism by which they occurred, supporting the claims made in plaintiff's administrative grievance, a well-established legal theory of liability: negligence. This satisfies the requirements of section 55-7B-6(c). Accordingly, plaintiff's medical malpractice claims will be given review.

**A. Medical Negligence and/or Medical Malpractice**

**Count One(a): Lack of Informed Consent**

Plaintiff alleges that on November 30, 2007, he directed M. Azumah, P.A. to lift and clip off only the offending corner of his right 4th toe's nail, to relieve his then-mild discomfort in that area from where the nail had grown inward. He contends that Azumah directed him to sign a blank consent form permitting him to first administer a local anesthetic, telling him that he would fill in the consent form later. Plaintiff avers that he lay back on the exam table and, unbeknownst to him until it was too late, Azumah then removed the entire toenail by pulling it out by the root. Plaintiff

---

[7] Indeed, the defendant's responses to plaintiff's administrative grievances specifically advise him, beginning as early as May 29, 2008, two and a half years before he filed suit, that "[t]he Administrative Remedy process does not address financial compensation. Please refer to the FTCA for this purpose." (Dkt.# 1-6 at 23).

contends that in order to make it appear that he had actually authorized Azumah to do so, Azumah later altered the text on the consent form to make it appear that plaintiff had consented to removal of the entire toenail.

"[T]herapy not authorized by the patient may amount to a tort -- a common law battery -- by the physician." Canterbury v. Spence, 464 F.2d 772, 783, 150 U.S. App. D.C. 263 (1972). The disclosure that a physician must make to a patient in obtaining informed consent prior to surgery is set forth in Adams v. El-Bash, 175 W. Va. 781; 338 S.E.2d 381 (W.Va. 1985):

> A physician has a duty to disclose information to his or her patient in order that the patient may give to the physician an informed consent to a particular medical procedure such as surgery. In the case of surgery, the physician ordinarily should disclose to the patient various considerations including (1) the possibility of the surgery, (2) the risks involved concerning the surgery, (3) alternative methods of treatment, (4) the risks relating to such alternative methods of treatment and (5) the results likely to occur if the patient remains untreated.

Adams v. El-Bash, *supra* at 784, *quoting* syl. pt. 2 of Cross v. Trapp, 170 W. Va. 459, 294 S.E.2d 446 (1982).

However, in malpractice cases, as in any negligence actions, in order to establish liability, a causal connection must exist between the failure to adequately disclose risks to the patient and actual harm. "An unrevealed risk that should have been made known must materialize, for otherwise the omission, however unpardonable, is legally without consequence. Occurrence of the risk must be harmful to the patient, for negligence unrelated to injury is nonactionable." Canterbury v. Spence, *supra* at 790.

West Virginia adopts the "objective test" in establishing proximate cause in informed consent cases: whether a reasonable person in the patient's position would have withheld consent if all material risks been disclosed. If disclosure of the material risks would not have changed the decision of a reasonable person in the patient's position, no causal connection exists between nondisclosure and the patient's damage. Under this rule, the patient's hindsight testimony as to what he would have

hypothetically done, though relevant, is not determinative of the issue. <u>Adams v. El-Bash</u>, *supra* at 386.

A careful review of the November 30, 2007 Request for Administration of Anesthesia and for Performance of Operations and Other Procedures (Dkt.# 14-6 at 1), suggests that the consent form may have been blank when signed.

On the "Request for Administration of Anesthesia And for Performance of Operations and Other Procedures" (Dkt.# 14-6 at 1), in "§A(1)(a), Identification," where the form directs the medical practitioner to "check all applicable boxes to indicate what the patient was consenting to: operation or procedure; anesthesia; sedation; transfusion," Azumah checked nothing; the section was left blank. Under "§A(1)(b), where the practitioner was instructed to "describe," Azumah wrote "Rt [sic] 4 toe – nail removal." Under "§B(2) Statement of Request," where the form read

> The nature and purpose of the operation or procedure, possible alternative methods of treatment, the risks involved, and the possibility of complications have been fully explained to me. I acknowledge that no guarantees have been made to me concerning the results of the operation or procedure. I understand the nature of the operation or procedure to be (describe operation or procedure in layman's language), _____ which is to be performed by or under the direction of Dr. _____

Mr. Azumah merely wrote "Rt 4th toe ingrown nail" in the first blank, and "Azumah" in the second.

In "§B(5), exceptions to surgery or anesthesia, if any are," Azumah merely wrote **0**. It would appear there were exceptions or alternatives to removal of plaintiff's entire toenail, but Mr. Azumah's response seems to indicate that he did not disclose any.

In "§C(8), Signatures," the form reads:

> COUNSELING PHYSICIAN/DENTIST: I have counseled this patient as to the nature of the proposed procedure(s), attendant risks involved, and expected results, as described above. I have also discussed potential problems related to recuperation, possible results of non-treatment, and significant alternative therapies.

A space was provided for the medical practitioner's signature, but Mr. Azumah left it blank.

In §C(9), the form reads:

> PATIENT: I understand the nature of the proposed procedure(s), attendant risks involved, and expected results, as described above, and hereby request such procedure(s) be performed).

There are spaces provided for both "signature of witness, excluding members of operating team," and the patient himself. There is no witness signature. Plaintiff's signature is present, as is Azumah's. (Dkt.# 14-6 at 1).

Azumah never filled in §1a of the form ("Check all applicable boxes: operation or procedure; sedation; anesthesia; transfusion"); it appears as if Azumah did not fully inform Giambalvo of what he intended to do before he did it.

Further, in §B(5), "exceptions to surgery or anesthesia, if any are" Azumah merely wrote "~~0~~." Clearly, there were exceptions and/or alternatives to removal of the entire nail; nevertheless, Azumah's response suggests that he did not disclose any. Finally, in "§C(9), Signatures," there is no signature of any witness to either plaintiff's consent or to the procedure.

The undersigned finds that plaintiff's consent to the November 30, 2007 procedure failed to meet any of the five factors for informed consent set forth in <u>Adams v. El-Bash</u>, *supra* at 784. The plaintiff has alleged he "made it clear to him [Azumah] I only sought to have the corner on the nail partially removed far enough to relieve the pain because this was not a chronic problem." (Dkt.# 1-7 at 22) . There is no indication from the form that Azumah disclosed the possibility of the surgery; the risks involved concerning it; any alternative methods of treating the ingrown nail, the risks relating to those alternative methods of treatment and the results likely to occur if the plaintiff remained untreated. The undersigned finds that disclosure of all material risks may have caused a reasonable person in the position of the plaintiff to refuse the complete removal of the toenail, given that there were far less extreme (and less painful) methods of treating the condition; thus a causal connection is found between the failure to disclose and the plaintiff's injury.

## Count One (b): Tampering with Medical Records

Plaintiff alleges that the U.S.P. Hazelton medical staff were not truthful or forthcoming in response to direct inquiries from BOP officials; failed to provide complete and accurate medical information to him and to his subsequent providers, and withheld and/or altered his medical records. The undersigned finds that plaintiff's allegations regarding U.S.P. Hazelton's medical staff's duplicity regarding his medical information and records have support in the record.

Plaintiff avers that after a post-injury delay in orthopedic treatment of four months, he was seen on March 26, 2008, by "Dr. Stoll," a "contracted" orthopedic specialist, who ordered x-rays of plaintiff's foot. The x-ray was not taken until April 25, 2008, a full month later. Plaintiff avers that the medical staff at U.S.P. Hazelton advised him that the x-rays were all negative, and despite being told at the March 26, 2008 visit that Dr. Stoll would see him again in follow-up, plaintiff avers he was never permitted to see Dr. Stoll again. (Dkt.# 1-1 at 22, ¶¶ 97 – 98). Three months later, on July 29, 2008, in response to plaintiff's "Inmate Request to Staff" asking for a written report from the prison's Clinical Director regarding his diagnosis, prognosis and treatment of his November 30, 2007 injury, Warden Joe Driver advised plaintiff that his records reveal "the lack of any disability" and "[y]ou had multiple radiographs taken which have always been read as normal except for mild arthritis of the joint." (Dkt.# 1-10 at 1). In fact, Warden Driver's statement omits mention of the findings of the April 25, 2008 x-ray of plaintiff's foot, showing "[a]bnormal ? [sic] soft tissue swelling and joint space narrowing/destruction 4th toe DIP.[8] Findings are compatible with changes of infection/septic joint. – Please correlate with specific area of concern." (Dkt.# 1-8 at 11*).

Again, one month later on May 29, 2008, in response to a grievance plaintiff filed on May 2, 2008, K.M. White, Regional Director of the BOP's Mid-Atlantic Regional Office advised plaintiff that

> [r]eview of your appeal with institution staff indicates your medical condition has been thoroughly evaluated and assessed. Review of your medical record reveals

---

[8] "DIP" references the distal interphalangeal joint, the last joint at the tip of the toe.

a medical history of chronic cellulitis and . . . (MRSA) infection of the right fourth toe, dating back to November 2007. On March 26, 2008, you[] [were] . . . evaluated by a contract orthopaedic specialist. Physical exam revealed slight swelling of the right fourth toe. The specialist reviewed previously completed diagnostic x-rays of your foot and reported that there was no sign of osteomyelitis, or infection of the bone. Following examination, the specialist recommended continuation of antibiotic therapy as previously described (ciproflaxin) [sic], use of a soft shoe, and completion of repeat diagnostic x-rays. On April 30, 2008, your toe related condition was reevaluated by your primary care provider. Physical examination revealed no signs of infection . . .

(Dkt.# 1-6 at 23).

Absent from the Regional Director's response is the report of the *results* of those "repeat diagnostic x-rays," the April 25, 2008 x-ray showing a septic, infected DIP joint, or osteomyelitis in the bone of plaintiff's toe. The incomplete medical records provided by plaintiff are devoid of any explanation as to why he was never seen again in follow-up by Dr. Stoll, the orthopedic specialist who ordered the April 25, 2008 follow up x-ray, or why the plaintiff was continued on ciprofloxacin, when clearly it had not prevented the progression of MRSA from his soft tissue into his bone.

Plaintiff avers that the relevant medical records of the November 30, 2007 procedure are missing, leading to his belief that the defendants have removed and/or concealed them from his medical records file. Plaintiff alleges that on February 26, 2008, almost three months after his November 30, 2007 toenail removal, he went to Hazelton's Health Services to obtain copies of his records. (Dkt.# 1-1 at 13, ¶52). He was never given copies of the records of the November 30, 2007 procedure and alleges he was advised that those records were "currently missing and considered lost." (Dkt.# 1-8 at 12). Review of the records provided to plaintiff by the BOP per his February 26, 2008 request, makes it apparent that, as of September 12, 2008, six and a half months after they were 'unavailable" to provide a copy to plaintiff, they were available to the BOP, who referenced details

of their alleged contents to support its denial of plaintiff's administrative grievance.[9]  As plaintiff contends, the complete medical records documenting what actually occurred on November 30, 2007, as well as some of the records of subsequent treatment, may have been withheld and not provided to him or to his subsequent providers.  (Dkt.# 1-8 at 12; Dkt.# 1-6 at 20; and Dkt.# 1-7 at 3).

Whether any of the plaintiff's medical records have indeed been altered and/or permanently made unavailable in this litigation by the defendant remains to be seen.

Plaintiff also alleges that although his foot wound was cultured on March 12, 2008, and reported infected with MRSA on March 14, 2008, he was not notified of his MRSA diagnosis until five days later, on March 19, 2008. (Dkt# 1-1 at 20, ¶88 and Dkt.# 1-6 at 19 -22).   He avers that nothing was ordered to treat the infection that day, but that the following day, when he was not present in the Health Services department, additional medications were prescribed by the Regional Associate Medical Director, and without his knowledge, were added to the entry for the previous day's visit.  (Dkt# 1-1 at 20, ¶89).  Further, he alleges that on March 21, 2008, Patricia Corbin PA ("Ms. Corbin") put an administrative note in his medical records to the effect that  since March 11, 2008, plaintiff had either been a "no-show" or had refused his medication.  Plaintiff avers that Ms. Corbin made no attempt to notify plaintiff, his housing officer, counselor, case or unit manager that any new medications had been ordered.  (Dkt# 1-1 at 20-21, ¶¶90-91).  Plaintiff avers that as a result, when he went to Health Services seeking care on March 24, 2008, Dr. Jorge Vasquez asked him why he had not been taking his medication. (Dkt.# 1-1 at 21, ¶92 – 94). The plaintiff appears to believe the Health Services staff was "setting him up," presumably in retaliation for his repetitive requests for care and grievances filed thereto.

Here, the defendant has ignored relevant portions of the complaint in favor of repeatedly

---

[9]  The September 12, 2008 denial by K.M. White, Regional Director of the Mid-Atlantic Regional Office can be found at Dkt.# 1-7 at 22.

denying that plaintiff did not comply with the MPLA.  However, the  defendant's assertions that plaintiff's claims must fail because he has not alleged facts sufficient to establish a breach of the duty by the Bureau's medical staff, his injuries cannot be the direct result of any breach of that duty, or because he failed to produce a screening certificate of merit cannot support their motion to dismiss.[10]

In ruling on the defendant's motion to dismiss, the court must accept as true the plaintiff's factual allegations.  Clearly, when considering the facts recited above, recognizing that the records are, as yet incomplete, and construing the allegations in the light most favorable to the plaintiff which are unrefuted by the defendant, the plaintiff has established a cognizable claim sufficient to overcome the defendant's motion to dismiss.

### Count Two:  Plaintiff's Medical Negligence Claim Against Michael Azumah, P.A.

Plaintiff alleges that immediately after the November 30, 2007 toenail removal,[11] Azumah wrapped a dressing around his toe that was so tight that it cut off the circulation in his toe.[12]  Plaintiff avers that Azumah instructed him not to remove the bandage, gave him a rubber glove to place over it in the shower, and told him to report to Health Services on Monday, December 3rd, 2007.  (Dkt.# 1-1 at 1, ¶ 26).  Plaintiff contends that he awoke the next morning in great pain; by six p.m. that day his pain was so unbearable he asked his Unit Officer to request that Health Services examine him. His Unit Officer, H. Mullins, reports that he called Health Services and spoke to one Nurse Dennison ("Dennison"), who, according to Officer Mullins, not only flatly refused to see plaintiff, but hung up on Officer Mullins. (Dkt.# 1-8 at 1).  Accordingly, plaintiff was not seen until around 11:30 a.m. the following day, Sunday, December 2nd, 2007, after he again complained he needed emergency

---

[10]  The undersigned's opinion might be different had the defendant filed a Motion for Summary Judgment and submitted affidavits in support of its version of the events in question.

[11]  The plaintiff alleges that he originally went to Health Services for treatment of his toenail at an unspecified time in the morning of November 30, 2007, and was told by by Azumah to come back at 11:30 a.m.; he avers that he did return at that time.  (Affidavit of Michael Giambalvo, Dkt.#  1-7 at 12-13.

[12]  Plaintiff's conclusion about the cause of his injury is uncontroverted in his medical records.

treatment to "an unknown Lieutenant" who contacted Health Services for him and then directed him to go there for treatment. By then, when the dressing was removed by Ronald Whitener, P.A. ("Whitener") approximately 48 hours after it was first applied, the toe was described as having no blood flow, appearing pale and/or black and bruised-looking at its base, and being numb to touch. (Dkt.# 14-9 at 1 and Dkt.# 1-6 at 17). Plaintiff alleges that when the dressing was removed and Whitener first saw the blackened toe, he asked plaintiff "who the hell wrapped this?" (Dkt.# 1-1 at 8, ¶ 29).[13] Ultimately, even from the limited records supplied by plaintiff, it was soon apparent that plaintiff had suffered a serious injury to the toe; once the dressing was removed, he rapidly developed swelling, tingling; numbness in some areas, severe pain and exquisite tenderness in others; redness; discoloration; blackened necrotic tissue; blistering, peeling and cracking of skin with bleeding, and nerve damage. Further, the wound that developed as a result of the skin breakdown from the injury became infected,[14] and was finally cultured on March 14, 2008, three and one half months later, and found to be infected with MRSA, a serious infection that ultimately invaded the bones of his foot, causing osteomyelitis, and perhaps nerve damage.[15] It appeares from the record that plaintiff's injury was proximately caused by Azumah's negligent and improper application of the tourniquet-like dressing.

The physician's assistant who removed the toe dressing on December 3, 2007 and found a blackened toe with no blood flow should have immediately recognized the damage with its potential

---

[13] Plaintiff avers that upon seeing his blackened toe, Whitener advised him that if he could not regain the circulation in the toe, that he might well lose the toe. (Dkt.# 1-6 at 17).

[14] The February 6, 2008 Chronological Record of Medical Care noted "objective" findings that plaintiff's toenail was removed on November 30, 2007, had been "[w]rapped tight, had darkening, pus. [Now] Toe w/ yellow pus, swelling; tingling. The "Extremities/foot exam" noted "4th right toe with swelling, ↓ sensation; redness of whole toe; cracking/peeling beneath toe on under surface." (Dkt.# 14-17 at 1).

[15] The treating orthopedic surgeon's July 2010 notes indicate that plaintiff's chronic severe neuropathic pain may very well be a result of his having developed either a Chronic Regional Pain Syndrome (CRPS) or a Reflex Sympathetic Dystrophy (RSD) as a result of the nerve injury from the tourniquet-like dressing that was left on for two days, the resulting skin necrosis and inflammation/infection. (Dkt.# 1-7 at 2-3). The prognosis for permanent pain relief from either condition is not good.

for further serious injury. The undersigned finds that the failure to refer the plaintiff for immediate medical care at a hospital likely further contributed to the severity of the plaintiff's injury.

As previously noted, in ruling on the defendants' motion to dismiss, the court must accept as true the plaintiff's factual allegations. Clearly, the facts recited above set forth a cognizable medical negligence claim. While the plaintiff's version of the events that took place between November 30, 2007 and when he filed his FTCA complaint on February 10, 2011 may be exaggerated, the court has nothing before it to support such a conclusion. The allegations plaintiff makes about the mechanism of his injury and the resultant injury are consistent with the limited medical records he was able to provide. Thus, inasmuch as the plaintiff has stated a cognizable claim, the defendant's motion to dismiss this portion of the complaint should be denied.

**Count Three: Whether U.S.P. Hazelton's Other Medical Staff were Negligent**

Plaintiff alleges that the treatment he received from medical personnel at USP Hazelton's Health Services for injuries resulting from the November 30, 2007 procedure was substandard, that Hazelton's Health Services staff was negligent; failed to fully document his symptoms; failed to appreciate the severity of his symptoms, condition and the significance of test results; failed to timely diagnose the complications that ensued from the November 30, 2007 procedure; and delayed providing appropriate and timely needed care, thus permitting plaintiff's condition to worsen, causing needless pain, suffering and permanent, disabling injuries.

The defendant does not refute plaintiff's allegations, and after a thorough review of the record, including what medical records plaintiff was able to provide, the undersigned finds there is evidence to support plaintiff's claims. Accordingly, the undersigned concludes that in viewing the facts in the light most favorable to the plaintiff, the plaintiff has stated a cognizable claim, sufficient to overcome the defendant's motion to dismiss.

**Count Four: Whether U.S.P. Hazelton Permits Unqualified Medical Practitioners to Provide Care to Inmates at the Prison and Whether those Providers Safely Prescribed Appropriate Medications for Plaintiff.**

Plaintiff avers that U.S.P. Hazelton permits practitioners who lack current privileges, practice agreements, protocols and qualifications to perform surgical procedures and provide post-operative care to inmates at the prison, and that the defendant failed to prescribe appropriate medications to avoid injury to his stomach and liver. However, nowhere in his voluminous complaint with its attachments or any of his many other subsequent filing does he expand on or ever mention these claims again.

Petitioner has not provided the court with any proof in support of these claims, merely bare conclusory allegations. He has not identified which of U.S.P. Hazelton's medical staff he is referring to, explained why he believes their qualifications are deficient, or how their alleged lack of current qualifications have harmed him. Nor has he identified which medications damaged his stomach or liver and in what way he was harmed. The undersigned finds that these claims are so vague, they fail to establish that petitioner is entitled to any relief. Accordingly, these claims are insufficiently pled under Fed. R. Civ. Pro. 8 and they should be denied.

## IX. Recommendation

For the foregoing reasons, the undersigned recommends that the defendant's Motion to Dismiss (Dkt.# 34) be **DENIED.**

Accordingly, the undersigned further recommends that petitioner's pending Motion Styled as "Request Case to be Heard by Jury" (Dkt.# 19) be **GRANTED.**

Within **fourteen (14) days** after being served with a copy of this report and recommendation, any party may file with the Clerk of Court written objections identifying those portions of the recommendation to which objection is made and the basis for such objections. A copy of such objections should also be submitted to the United States District Judge. **Failure to timely file objections to the Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Recommendation**. 28 U.S.C. § 636(b)(1);

Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to the *pro se* plaintiff by certified mail, return receipt requested, to his last known address as reflected on the docket sheet. The Clerk is further directed to provide a copy of this Report and Recommendation to any counsel of record as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

DATED: January 10, 2012

/s/ James E. Seibert
JAMES E. SEIBERT
UNITED STATES MAGISTRATE JUDGE