IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

MICHAEL PATRICK GIAMBALVO,

        Plaintiff,

        v.                                       Civil Action No. 1:11-CV-14

UNITED STATES OF AMERICA,

        Defendant.

## AMENDED
## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND MEMORANDUM ORDER

This is an action brought by Plaintiff Michael Patrick Giambalvo pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680. Plaintiff's complaint,[1] filed with the Court on February 10, 2011, stated three causes of action. Count I alleges "[n]egligence, carelessness and medical malpractice" by the medical staff at United States Penitentiary Hazelton ("USP Hazelton"). Count II alleges permanent damage to Plaintiff's foot and seeks, among other things, injunctive relief for future podiatry care.[2] Count III alleges "mental and emotional distress, extreme pain and suffering" due to USP Hazelton's medical malpractice.

On November 24-26, 2014, and December 11, 2014, the parties appeared before this Court for a bench trial as to the three counts. Plaintiff was represented by Jay T. McCamic, Esq. The government was represented by Alan G. McGonigal, Esq., and Erin D. Reisenweber, Esq. This Court heard testimony from Plaintiff, Dr. Ronald Long, Dr. Gayle Galan, Dr. Charles Argoff, Daniel

---

[1] ECF No. 1.

[2] In Plaintiff's post-trial brief, he submits that because "injunctive relief . . . is something not contemplated or permitted by an injunction in general nor in medical malpractice actions under the FTCA and because monetary damages for such future case is something that is contemplated both within the law and the rest of the complaint, Count Two shall be dismissed as moot." ECF No. 160 at 18-19. Therefore, Count II is dismissed as moot, and only Counts I and III remain.

Baierl, Daniel Selby, Dr. Reginald Hall, Dr. Dino Delaportas, Nancy Forest,[3] Michael Boyes, and Paul Groves, and reviewed the deposition testimony of Henry Mullins, Ronald Whitener, and Michael Azumah.

Having heard and reviewed the testimony and evidence presented by the parties and having reviewed the parties' post-trial briefs, the Court hereby makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

1.      In November 2007, Giambalvo was incarcerated at USP Hazelton, located in Bruceton Mills, West Virginia. Giambalvo had been a prisoner at USP Hazelton since March 2007.

2.      On November 30, 2007, Giambalvo reported to Michael Azumah, a mid-level practitioner at USP Hazelton, about a painful ingrown toenail on his right fourth toe.

3.      Around midday on November 30, 2007, Azumah examined Giambalvo and prepared to remove Giambalvo's right fourth toenail.

4.      To justify the removal of an entire toenail, a significant amount of infection is required. Observing pus forming on either side of Giambalvo's toenail and finding the toenail to be swollen and warm, Azumah believed the toenail was infected.

5.      Azumah cleaned Giambalvo's toenail and numbed the toe with a local anesthetic. He then removed the entire toenail with a needle holder.

6.      After removal, Azumah cleaned the toe with iodine and applied antibiotic cream. No culture was taken to identify whether the infection was Methicillin-resistant Staphylococcus aureus

---

[3] Ms. Forest first testified in person on November 25, 2014. She completed her testimony by telephone on December 11, 2014.

("MRSA").

7. According to the Federal Bureau of Prisons guidelines concerning the management of MRSA in federal prisons, routine bacterial cultures should be obtained because MRSA cannot be distinguished from other infections without a culture. Pl. Ex. 1b, FED. BUREAU OF PRISONS, MANAGEMENT OF METHICILLIN-RESISTANT STAPHYLOCOCCUS AUREUS (MRSA) INFECTIONS 3 (2005) [hereinafter GUIDELINES].

8. BOP Guidelines suggest correctional health care providers to "consider MRSA infection in the differential diagnosis for all inmates presenting with skin and soft tissue infections or other clinical presentations consistent with a staphylococcal infection." *Id.*

9. BOP Guidelines note that "[c]ulturing pus from a skin infection is the most common way to detect MRSA." GUIDELINES, *supra* ¶ 7, at 3, 29. Additionally, "[w]ound cultures obtained from expressed pus (avoiding skin contamination) are diagnostically meaningful; whereas positive cultures obtained directly from the surface of a wound are of limited value in detecting true infection." *Id.*

10. Azumah's failure to culture the pus-filled, infected right fourth toe on Giambalvo's right foot violated BOP Guidelines and fell below the standard of care.

11. For the infection on Giambalvo's toe, Azumah prescribed Keflex, an antibiotic. Keflex generally covers several skin and tissue infections. Dr. Galan testified that Keflex is not effective against MRSA. Instead, Keflex eliminates "good bacteria" located on the toe. Trial Tr. vol. 1, 291:15-16. When a toenail is removed, the area that "tucks under the skin" is also removed. Trial Tr. vol. 1, 292:2. Consequently, without good bacteria, MRSA is able "to take a greater foothold because you have killed the bacteria that just are colonized on the skin." Trial Tr. vol 1, 292:5-7.

12.     After removing Giambalvo's toenail, Azumah bandaged the toe and wrapped it in dressing. He instructed Giambalvo to elevate his right foot for the first twenty-four hours and then return to health services for new dressing. Giambalvo was also instructed that if he felt too much pain, he could untie the dressing. Giambalvo was not provided any change of dressing.

13.     Dr. Galan testified that the removal of an entire toenail requires compression to stop any bleeding in the nail bed. She further explained that "without having a planned recheck in an hour or two" after wrapping the toe, the compression around the toe prevents the local anesthetic from naturally circulating out of the toe.

14.     If a bandage is excessively compressive and there is little blood supply, the local anesthesia will not circulate out in a timely manner. Instead, the toe's numbness will persist for an increased period of time. The extended time of numbness, and correlated delay in pain, could last from eight to twenty hours, thus delaying an individual's awareness of pain.

15.     The next morning, Saturday, December 1, 2007, Giambalvo began to feel pain in his operated toe. That afternoon, at 4:00 p.m., Correctional Officer Henry Mullins began his shift a USP Hazelton.

16.     Also at 4:00 p.m., an inmate count is conducted. An inmate count at USP Hazelton takes roughly sixty to eighty minutes to complete.

17.     At 5:15 p.m., Giambalvo approached Officer Mullins, requesting him to contact health services to examine Giambalvo's toe.

18.     At USP Hazelton in 2007, only one or two staff members were available at health services during the weekend. At the time, USP Hazelton housed roughly 1400 inmates. In deposition, Officer Mullins testified that during weekends at USP Hazleton only if an "inmate was

unresponsive" or "bleeding profusely" would an officer would call health services for assistance and medical treatment. Mullins Dep. 15:18-21, Nov. 19, 2014. Otherwise, the inmate would be advised to complete a sick call form and be evaluated the next Monday.

19.     During Officer Mullins's shift, Giambalvo asked Officer Mullins to contact health services at least four times. Eventually, Officer Mullins called health services to "appease" Giambalvo. Mullins Dep. 38:11-12. Health services declined to see Giambalvo and advised him to complete a sick call form

20.     The next day, on Sunday, December 2, 2007, Giambalvo again requested to be seen by health services and was examined by Physician's Assistance Ronald Whitener.

21.     During the examination, Whitener found that Giambalvo's bandage was wrapped too tightly. Additionally, he reported Giambalvo's operated toe was pale, numb, and receiving no blood flow.

22.     After five minutes of massaging the toe, Whitener was able to observe some blanching. According to the testimony of Dr. Gayle Galan, this is "consistent with significant vascular compromise" in the toe. Trial Tr. vol. 1, 290:10-13.

23.     By failing to check the compressive dressing within a reasonable time, the USP Hazelton medical staff's treatment of Giambalvo's toe after removing his toenail on November 30, 2007, fell below the standard of care.

24.     Without blood flow, tissue death may occur. Tissue death may result in the lose of a toe or necrosis.

25.     A culture was not taken during the December 2, 2007, examination.

26.     Giambalvo was examined by Whitener on December 3, 2007. Whitener observed that

Giambalvo's toe was swollen, blistered, and severely tender. Giambalvo was treated with Rocephin and Cipro. According to Dr. Galan, Rocephin does not treat MRSA and Cipro "is not recommended as a drug for MRSA because of the high likelihood of the MRSA being resistant in the first place or developing resistance as time goes along [while] the patient is on the Cipro." Trial Tr. vol. 1, 292:20-293:5. A culture was not taken during the December 3, 2007, examination of Giambalvo's toe.

27.    Even though Whitener did not observe pus on December 3, 2007, BOP Guidelines provide that "cultures should be obtained whenever possible from purulent drainage from the skin . . . ." GUIDELINES, *supra* ¶ 7. Dr. Galan testified that medical staff could culture the blisters on Giambalvo's toe and would have detected MRSA.

28.    Giambalvo was examined by Whitener on December 11, 2007. Whitener observed that Giambalvo's toe was swollen and blistered. Whitener also observed an area of necrosis on Giambalvo's toe. Again, Giambalvo was treated with Rocephin and Cipro. A culture was not taken during the examination.

29.    According to Dr. Galan's testimony, a culture could have been made on December 11, 2007, from Giambalvo's blisters.

30.    On December 27, 2007, it was observed that Giambalvo had bleeding at the bottom of his operated toe and the entire toe was numb and red in color.

31.    Giambalvo was examined by Whitener on January 7, 2008. Whitener observed decreased swelling and redness on Giambalvo's toe. Because Whitener did not observe exudate or pus, a culture was not taken during the examination.

32.    On February 6, 2008, Giambalvo was examined by health services. It was observed

that Giambalvo's entire toe was swollen and red. Giambalvo was assessed with cellulitis and Keflex was prescribed. A culture was not taken during the examination.

33.     On February 11, 2008, Giambalvo's toe was x-rayed. The x-ray demonstrated degenerative changes and thinning of the bone around the joint, however, the radiologist noted no definite erosions to suggest osteomyelitis. Nevertheless, osteomyelitis may take up to eight weeks or more to appear on an x-ray. According to Dr. Galan, "if warranted, MRI is more sensitive for osteomyelitis. So there was no erosions on this x-ray, but this does not rule out osteomyelitis." Trial Tr. vol. 1, 294:12-14.

34.     On March 10, 2008, Giambalvo was examined by health services. His toe was cultured on March 12, 2008, and he was again prescribed Cipro.

35.     Prior to March 10, 2008, the actions by the medical staff at USP Hazelton – to not culture Giambalvo's toe when pus or blisters were available and to prescribe ineffective and possibly damaging antibiotics – fell below the standard of care.

36.     On March 14, 2008, the results of the culture taken on March 10, 2008, confirmed MRSA in Giambalvo's operated toe.

37.     On March 19, 2008, Cipro was discontinued. Giambalvo was prescribed Clindamycin and Bactrim. These medications are effective antibiotics against MRSA.

38.     Giambalvo reported to USP Hazelton health services that the prescribed combination of Clindamycin and Bactrim was making him sick. Dr. Galan testified that this is "not at all unusual, because that combination is fairly potent . . . ." Trial Tr. vol. 1, 295:5-6.

39.     Documentation suggests that Giambalvo was not taking Clindamycin and Bactrim as prescribed.

40.    According to the BOP Guidelines, it "is strongly recommended" for health officials to directly observe whether a prisoner is properly taking his MRSA antibiotics. GUIDELINES, *supra* ¶ 7, at 5.

41.    According to Dr. Galan, if Giambalvo was unable to orally take the antibiotics, an intravenous option was available.

42.    The failure to ensure Giambalvo was taking his prescribed MRSA antibiotics fell below the standard of care.

43.    Giambalvo was examined by Whitener on April 12, 2008. Whitener observed 0.5 centimeters of tissue loss in the web of Giambalvo's operated toe. Whitener also noted one centimeter of skin discoloration, but good blanching.

44.    On April 25, 2008, Giambalvo's toe was x-rayed. The reading radiologist found the results of Giambalvo's x-ray abnormal. The x-ray demonstrated "soft tissue swelling and joint space narrowing/destruction" in the distal interphalangeal joint of Giambalvo's operated toe. Jnt. Ex. 1. These findings were noted to be "compatible with changes of infection/septic joint." *Id.*

45.    Giambalvo was examined by Whitener on April 30, 2008. Whitener observed necrosis and some areas of cracking and peeling on Giambalvo's toe. Otherwise, Whitener noted that Giambalvo's toe displayed good blanching and no signs on infection.

46.    Giambalvo was examined by Whitener on May 25, 2008. Whitener noted no sign of infection on Giambalvo's toe.

47.    A "chronological record of medical care," dated June 20, 2008, notes a possibility of a septic joint in Giambalvo's operated toe.

48.    On June 24, 2008, Giambalvo's toe was x-rayed. The findings were negative.

49.　　On September 18, 2008, Giambalvo was transferred from USP Hazelton to Federal Correctional Institution Gilmer ("FCI Gilmer"), located in Glenville, West Virginia. On October 15, 2008, Giambalvo was transferred from FCI Gilmer to Federal Correctional Institute Otisville ("FCI Otisville"), located in Otisville, New York.

50.　　On December 17, 2008, Giambalvo was examined at FCI Otisville. An MRI was taken of Giambalvo's right foot. A subsequent medical report noted Giambalvo's medical history included "[c]hronic pain in [right fourth] toe area since infection with MERSA." Jnt. Ex. 14. The report noted fluid found in the third and fourth, "and to a lesser degree" second and fifth, tendon sheaths of Giambalvo's right foot. According to the report, "[t]he soft tissues surrounding the [fourth and third] metatarsal and phalanges demonstrate prominent fluid." *Id*. The MRI revealed "[m]ildly increased T2 signal . . . within the [fourth and third] metatarsals." *Id.* The report concluded this evidence to be "suggestive of inflammatory change" and infection in the bone of Giambalvo's right foot. *Id.* The report assessed that "[w]ith [Giambalvo's] clinical history of a MERSA infection, an infectious etiology would be of consideration. Further diagnostic assessment with correlation to a nuclear medicine white blood cell study is advised." *Id.*

51.　　On March 4, 2009, Giambalvo was examined at FCI Otisville. Believing Giambalvo may have chronic osteomyelitis, he was prescribed Bactrim for six weeks.

52.　　On March 23, 2009, Giambalvo underwent a bone scan of his right foot. The scan was negative, noting no evidence of osteomyelitis.

53.　　According to Dr. Galan, the use of Bactrim in March 2009 "on a persistent and ongoing basis" appeared to have resolved Giambalvo's infection. Trial. Tr., vol. 1, 335:18.

54.　　In June 2009, Giambalvo was transferred to Federal Medical Center Butner ("FMC

Butner"), located in Butner, North Carolina.

55.     Through at least 2011, while at FMC Butner, Giambalvo was treated by Dr. Reginald Hall.

56.     On November 17, 2009, Giambalvo underwent an MRI at FMC Butner. The MRI reported "[n]o definite abnormality," however, the "absence of contrast limits evaluation." Gov't. Ex. 85.

57.     On July 8, 2010, Dr. Hall created an administrative note, detailing possible diagnoses for Giambalvo's foot pain. In part, Dr. Hall wrote that:

> It is certainly possible to injure the nerve(s) with a tourniquet or dressing that is extremely tight (if it were left on for a long time). It is also possible to cause skin necrosis which apparently [Giambalvo] had. The combination of this and inflammation/infection may . . . be enough to initiate [Chronic Regional Pain Syndrome]. . . . [Giambalvo's] bone scan and clinical exam don't seem consistent with this diagnosis but doesn't [rule out] [Chronic Regional Pain Syndrome].
> . . .
> I need to talk with several medical providers before proceeding any further.

Jnt. Ex. 24.

58.     During direct examination at trial, Dr. Reginald Long described Chronic Regional Pain Syndrome[4] ("CRPS") as:

> ANSWER: [A] neuropathic pain condition that is affecting a portion of their body. It can occur anywhere in the body. It has a propensity for affecting the limb, a hand or a foot. It typically occurs after a period of immobilization or a traumatic episode, be it surgery, fracture, a crush. Maybe [five] percent they can't find a cause, so they'll say it can occur spontaneously. But what happens is you'll have a period of persistent pain, which is a characteristic feature, the dominant feature, and then you'll also start to see changes within the limb itself.
>
> QUESTION: What kind of changes?

---

[4] As discussed during trial, CRPS has been referred to by many names. For consistency and clarity, the undersigned will address the condition - also known as "Reflex Sympathetic Dystrophy," "Pseudoexstrophy," "Algodystrophy," or even "Causalgia" - simply as CRPS.

ANSWER: You can see swelling, edema. You can see changes in the tissue. It can become color difference, temperature difference, changes in the hair, changes in the nails, changes in bone. You'll see movement changes. You'll see increased sensitivity. Even light touch will become painful. Pain can become – like the pinprick can become exaggerated. You can see changes in sweating. So it's really a nervous system problem, so you can't just cut that limb off because that won't help a bit. It may actually make it worse, because the disease actually lives in the peripheral and the central nervous system.

Trial Tr. vol. 1, 211:16-212:12.

59.     Because Dr. Hall believed Giambalvo may be suffering from CRPS, Dr. Hall referred Giambalvo for a consultation with Dr. Richard Bruch, an orthopaedic specialist.

60.     Dr. Bruch examined Giambalvo on October 28, 2010. Dr. Bruch concluded Giambalvo did not have CRPS, but "[l]ikely" had interdigital neuroma in the third web space of his right foot. Jnt. Ex. 27.

61.     The parties have stipulated that Dr. Hall photographed Giambalvo's right foot in August or September 2010 while Giambalvo was incarcerated at FMC Butner.

62.     During trial, Dr. Charles Argoff was shown the photos of Giambalvo's foot taken by Dr. Hall in 2010. In examining these photographs, Dr. Argoff testified that he did not believe the photos demonstrated the foot "of someone who is experiencing CRPS at this time." Trial Tr. vol. 2, 12:20. Dr. Argoff explained that because the pictures demonstrated an absence of sweating, swelling, or vasomotor changes, the elements to medically diagnose CRPS[5] were not met in the 2010 photographs.

63.     In August 2012, Giambalvo self-removed the big toenail from his right foot.

64.     In a medical report dated August 24, 2012, Giambalvo reported extreme pain in his

---

[5] The elements to medically diagnose CRPS are referred to as the "Budapest criteria." The Budapest criteria is the standard for diagnosing CRPS. According to Dr. Argoff, the criteria requires at least two out of three abnormalities in three different categories of examination.

right toes and stated that he was unable to walk or put any weight on his right foot.

65.     Beginning in September 2012, Giambalvo testified that he began to see increasing swelling in his foot and ankle. During this time, swelling reached Giambalvo's upper leg.

66.     Giambalvo was released from BOP custody in December 2012.

67.     Photographs were taken of Giambalvo's right foot in November 2012, January 2013, and February 2013. According to Dr. Charles Argoff, these photographs display an "extremely swollen foot" with varying degrees of vasomotor disturbance and discoloration. Trial Trial Tr. vol. 2, 18:4-7.

68.     In March 2014, Giambalvo again self-removed the big toenail from his right foot.

69.     In June 2014, additional photographs were taken of Giambalvo's right foot by Dr. Long. According to both Dr. Argoff and Dr. Long, these photos display swelling, redness, and a contracture of the first and second toe.

70.     During trial, Dr. Hall was provided the photographs taken in November 2012, January 2013, February 2013, and June 2014. After reviewing the photographs, Dr. Hall testified that, while at FMC Butner, Giambalvo's foot, ankle, or leg never appeared as they did in the photographs provided.

71.     In comparing the photographs taken in 2010 to the photographs taken in February 2013, Dr. Argoff remarked "[t]hey're like different feet." Trial Tr. vol. 2, 13:11.

72.     Giambalvo was examined by Dr. Long on June 16, 2014, in Flourtown, Pennsylvania. In a previous report, Dr. Long believed Giambalvo currently suffers from CRPS. After examining Giambalvo, Dr. Long confirmed his previous diagnosis. During the June 16, 2014, examination, Dr. Long observed that:

The foot and lower extremity is kept carefully wrapped as the slightest touch produces exquisite pain. . . . There is a clear difference between in the size of the right foot versus the left food . . . [Giambalvo] complains of decreased range of motion and weakness in the right foot and right lower extremity. He has stiffness in the right foot and leg. His toes are curled under, and he is unable to straighten them. The skin of the foot is shiny. On physical examination Mr. Giambalvo meets all of the [Budapest] criteria for the signs and symptoms [of CRPS].

Pl. Ex. 2.

73.     Dr. Long and Dr. Argoff concur that the Budapest criteria is the only accepted standard for diagnosing CRPS.

74.     Based on the medical evidence and photographs presented at trial, Dr. Argoff concluded that there is no "evidence until 2012 of a foot that looks like it might be consistent with CRPS." Trial Tr. vol. 2, 20:18-19.

75.     During Dr. Argoff's testimony, the Court asked Dr. Argoff in his "experience or in the medical literature for CRPS, what is the longest period of time that CRPS has lain dormant after a traumatic event?" Trial Tr. vol. 2, 43:6-8. Dr. Argoff answered "[c]ertainly within six to [twelve] months." Trial Tr. vol. 2, 43:20.

76.     The pictures used by Dr. Argoff to conclude Giambalvo did not have CRPS in 2010 were taken nearly three years after Giambalvo's original toenail removal at USP Hazelton.

77.     Currently, Giambalvo suffers from CRPS.

78.     Giambalvo's symptoms of CRPS did not develop from any incident occurring before 2012.

79.     Giambalvo is a 44-year-old white male. Based on the mortality rates published by the United States Social Security Administration, and revised as of May 31, 2013, Giambalvo has a life expectancy of 78.7 years of age, or 33.7 more years.

80.     Giambalvo is primarily confined to using a wheelchair.

81.     Using a cane, Giambalvo can walk very short distances with a pressurized boot that provides greater load reduction in the forefoot.

82.     For the rest of his life Giambalvo will experience pain, restricted range of motion, loss of strength, and compromised mobility.

83.     According to Daniel Baierl's life care plan for Giambalvo, Giambalvo will need lifelong medical attention and care.

84.     The following chart sets forth the estimated cost of medical care for a person with CRPS, as stated by Baierl in his life care plan:

| Projected Care | No. of Years Required | Annual Cost | Total Annual Cost | Total One Time Cost |
|---|---|---|---|---|
| Routine Medical Care: | 32.7 | $11,560.00 | $378,012.00 | $2,242.00 |
| Procedures/ Hospitalizations/ Surgeries: | 0.0 | $0.00 | $0.00 | $20,373.25 |
| Projected Evaluations: | 26.0 | $415.00 | $10,790.00 | $0.00 |
| Therapies: | 4.0 | $14,013.00 | $56,052.00 | $40,636.00 |
| Diagnostic Testing | 33.7 | $1,701.00 | $57,323.00 | $0.00 |
| Medications: | 33.7 | $12,917.35 | $435,314.69 | $0.00 |
| Orthotics/ Prosthetics: | 33.7 | $215.00 | $7,245.00 | $0.00 |
| Wheelchairs: | 33.7 | $297.56 | $10,027.77 | $0.00 |
| Wheelchair Accessories and Maintenance: | 33.7 | $302.09 | $10,180.43 | $0.00 |
| Aids for Independent Living: | 33.7 | $114.00 | $3,841.80 | $250.00 |
| Home Care: | 33.7 | $8,429.25 | $284,065.72 | $0.00 |
| Case Management: | 33.7 | $7,200.00 | $242,640.00 | $0.00 |
| Health, Strength, Recreational: | 20.0 | $540.00 | $10,800.00 | $0.00 |
| **Total Annual Cost:** | | | $1,499,048.11 | |

| | | | | |
|---|---|---|---|---|
| **Total One Time Cost:** | | | | $63,501.00 |
| **Total Cost:** | | | | <u>$1,562,549.11</u> |

85.    At trial, Nancy Forest testified about the accuracy of Baierl's life care plan. Forest testified that Baierl's plan offered too many specialist visitations, provided overlapping care, and overestimated several medical costs.

86.    The following chart sets forth the estimated cost of medical care for a person with CRPS, as stated by Forest in her trial testimony and critique of Baierl's life care plan:

| **Projected Care** | **No. of Years Required** | **Annual Cost** | **Total Annual Cost** | **Total One Time Cost** |
|---|---|---|---|---|
| Routine Medical Care: | 32.7 | $1,676.00 | $54,805.20 | $2,534.00 |
| Procedures/ Hospitalizations/ Surgeries: | 0.0 | $0.00 | $0.00 | $2,873.25 |
| Projected Evaluations: | 26.0 | $415.00 | $10,790.00 | $0.00 |
| Therapies: | 1.0 | $0.00 | $0.00 | $40,636.00 |
| Diagnostic Testing | 33.7 | $1,225.00 | $41,282.50 | $0.00 |
| Medications: | 33.7 | $10,818.60 | $364,586.82 | $0.00 |
| Orthotics/ Prosthetics: | 33.7 | $215.00 | $7,245.50 | $0.00 |
| Wheelchairs: | 33.7 | $102.81 | $3464.70 | $0.00 |
| Wheelchair Accessories and Maintenance: | 33.7 | $242.19 | $1861.80 | $0.00 |
| Aids for Independent Living: | 33.7 | $114.00 | $3,841.80 | $250.00 |
| Home Care: | 33.7 | $8,429.25 | $284,065.73 | $0.00 |
| Case Management: | 33.7 | $0.00 | $0.00 | $0.00 |
| Health, Strength, Recreational: | 20.0 | $540.00 | $10,800.00 | $0.00 |
| **Total Annual Cost:** | | | $782,744.10 | |
| **Total One Time Cost:** | | | | $46,293.25 |

| Total Cost: | | | $829,037.35 |
|---|---|---|---|

87.     According to Daniel Selby's lost income capacity calculations, Giambalvo's pre-injury income capacity ranges from $87,688.00 to $152,442.00.

88.     Giambalvo has rarely, if ever, held steady employment and maintains a significant criminal record. Out of a possible twenty-eight year work history, Giambalvo has only worked nearly three years.

89.     There was no testimony at trial that discussed the calculation of damages related to the BOP's actions as a proximate cause to Giambalvo's degenerative and permanent right foot injuries but not as a proximate cause of his CRPS.

## II. CONCLUSIONS OF LAW

1.     Generally, the United States is immune from suit except as it consents to be sued. A suit against the Government cannot proceed absent a waiver of sovereign immunity. The FTCA is a limited waiver of sovereign immunity, permitting:

> money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. §§ 1346(b), 2671–2680.

2.     This limited waiver of sovereign immunity is subject to the prerequisite that the tort claim first be submitted to the appropriate federal agency within two years of accrual of the cause of action and that there be a final denial of the claim by the reviewing agency. 28 U.S.C. § 2401(b).

Giambalvo has met this prerequisite by exhausting his administrative remedies with the BOP before filing the instant complaint.

3.      Because the alleged medical malpractice took place at USP Hazelton, located in Bruceton Mills, West Virginia, this Court must apply the laws of the State of West Virginia. *See* 28 U.S.C. §§ 1346(b), 2671–2680.

4.      In West Virginia, medical malpractice or medial professional liability is covered by the West Virginia Medical Professional Liability Act ("MPLA"), W. VA. CODE § 55-7B-1 *et seq*.

5.      Under the MPLA, the elements to show "that an injury or death resulted from the failure of a health care provider to follow the accepted standard of care" are:

> (1) The health care provider failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances; and
>
> (2) Such failure was a proximate cause of the injury or death.

§ 55-7B-3(a).

6.      A plaintiff bears the burden to "establish that the defendant doctor deviated from some standard of care, and that the deviation was 'a proximate cause' of the plaintiff's injury." *Mays v. Chang,* 579 S.E.2d 561, 565 (W. Va. 2003); *see also Bellomy v. United States*, 888 F. Supp. 760, 764 (S.D.W. Va. 1995).

7.      Therefore, Giambalvo must prove, by a preponderance of the evidence, (1) the applicable medical standard of care; (2) that, in treating Giambalvo, the government failed to meet that standard of care; and (3) that the government's negligence was a proximate cause of Giambalvo's injury.

8.  To determine the accepted standard of care, the testimony of a "competent expert witness[]" is required. § 55-7B-7(a). Expert testimony may be admitted if: (1) the testimony is "actually held by the expert witness," (2) "the opinion can be testified to with reasonable medical probability," (3) "the expert witness possesses professional knowledge and expertise coupled with knowledge of the applicable standard of care . . . ," (4) the expert has a license to practice medicine, and (5) the expert is "engaged or qualified in a medical field in which the [expert witness] has experience and/or training in diagnosing or treating injuries or conditions similar to those of [a plaintiff]." *Id.*

9.  "To be admissible, the expert testimony supporting a plaintiff's medical malpractice claim need not be expressed in terms of reasonable certainty, but must be expressed at least in terms of reasonable probability." *Bellomy*, 888 F. Supp. at 765. The government "is not bound to provide the patient with the highest degree of care possible." *Id.* However:

> Where a physician does not specially contract to provide a higher degree of care, he or she is required to exercise only such reasonable and ordinary skill and diligence as are ordinarily exercised by the average members of the profession in good standing . . . and in the same general line of practice, regard being had to the state of medical science at the time the cause of action accrued.

*Id.* (internal quotation marks omitted).

10.  Furthermore, the standard of care applicable to physicians treating prisoners is the same as the standard that applies to the general medical community. *District of Columbia v. Mitchell*, 533 A.2d 629, 648 (D.C. 1987).

11.  Proximate cause "must be understood to be that cause which in actual sequence, unbroken by any independent cause, produced the wrong complained of, without which the wrong would not have occurred." *Mays*, 579 S.E.2d at 565 (quoting *Webb v. Sessler*, 63 S.E.2d 65 (W. Va.

1950)). "The proximate cause of an injury is the last negligent act contributing to the injury and without which the injury would not have occurred." *Id.* (quoting *Hartley v. Crede*, 82 S.E.2d 672 (W. Va. 1954)).

12.     "[A] plaintiff's burden of proof is to show that a defendant's breach of a particular duty of care was *a* proximate cause of the plaintiff's injury, not the *sole* proximate cause." *Id.* (emphasis in original). This burden "is satisfied when the plaintiff shows the physician's 'acts or omissions increased the risk of harm to the plaintiff and that such increased risk of harm was a substantial factor in bringing about the ultimate injury to the plaintiff[.]'" *Bellomy*, 888 F. Supp. at 766 (quoting *Thornton v. CAMC*, 305 S.E.2d 316 (W. Va. 1983)).

## 1. The Actions by the Medical Staff at USP Hazelton Fell Below the Required Standard of Care

13.     With respect to the removal of Giambalvo's toenail by Azumah, this Court finds the testimony of Dr. Galan to be more credible and useful than that of any other testifying physician.

14.     According to Dr. Galan, only "a significant infection" would require the removal of an entire toenail. Trial Tr. vol. 1, 287:14-15.

15.     On November 30, 2007, Azumah believed Giambalvo's toenail was infected. Before removing the toenail, Azumah observed pus around the toenail and found the toenail to be swollen and warm.

16.     Azumah did not breach his standard of care in removing Giambalvo's entire toenail.

17.     BOP Guidelines require routine bacterial cultures whenever possible from purulent drainage from skin and soft tissue infections and aspirated material from potentially infected fluid collections. GUIDELINES, *supra* ¶ 7.

18.     Dr. Galan testified that the failure to culture Giambavlo's toe breached the standard of care. This Court agrees.

19.     After removing Giambalvo's toenail, Azumah prescribed Keflex, an antibiotic. Azumah also bandaged the toe, wrapped it in dressing, and instructed Giambalvo to return to health services for new dressing.

20.     Giambalvo was prevented from being examined by USP Hazelton health services for roughly forty-eight hours.

21.     The removal of an entire toenail requires compression to stop any bleeding in the nail bed. Without a recheck within an hour or two of the procedure, overly tight compression around the operated toe could cause permanent damage.

22.     When Giambalvo was finally examined two days after his toenail removal, it was discovered the wrapping around his toe was too tight. Whitener found that Giambalvo's toe was pale, numb, and receiving no blood flow. The toe began to blanch only after five minutes of massage. According to Dr. Galan, the tight wrapping caused "significant vascular compromise" in Giambalvo's toe. Trial Tr. vol. 1, 290:10-13.

23.     Dr. Galan testified that the failure to check Giambalvo's compressive dressing within a reasonable time fell below the standard of care. This Court agrees.

24.     From November 2007 to February 2008, Giambalvo's toe was never cultured. During this period, Giambalvo was prescribed Keflex, Rocephin, and Cipro at various times. Dr. Galan testified that these antibiotics were ineffective, and possibly counterproductive, against Giambalvo's MRSA.

25.     A culture of Giambalvo's toe was finally taken in March 2008. MRSA was confirmed shortly thereafter.

26.     Dr. Galan testified that the failure by the USP Hazelton medical staff to culture Giambalvo's toe when pus or blisters were evident and prescribe ineffective and possibly damaging antibiotics violated BOP Guidelines and fell below the standard the care. This Court agrees.

27.     After MRSA was confirmed in Giambalvo's toe, he was prescribed a combination of medications that made him reportedly ill. Giambalvo stopped taking the prescribed medications.

28.     BOP guidelines strongly recommend staff to directly observe whether a prisoner is properly taking their medication to combat MRSA. GUIDELINES, *supra* ¶ 7, at 5. Dr. Galan testified that if Giambalvo could not orally take his medication, an intravenous option is available.

29.     Dr. Galan testified that the failure of the USP Hazelton medical staff to ensure Giambalvo was taking his prescribed MRSA medication fell below the standard of care. This Court agrees.

## 2. The Actions by the USP Hazelton Medical Staff Were a Proximate Cause to Some of Giambalvo's Injuries

30.     Prior to being transferred from USP Hazelton to FCI Otisville, x-rays displayed degenerative changes and thinning of the bone around the joint of Giambalvo's operated toe. Another x-ray revealed soft-tissue swelling and joint damage "compatible with changes of infection/septic joint."

31.     At FCI Otisville, an MRI of Giambalvo's right foot displayed fluid and possible "inflammatory change" and infection in the bone of Giambalvo's right foot. After the MRI was analyzed, Giambalvo was prescribed Bactrim.

32.     According to Dr. Galan, the use of Bactrim resolved Giambalvo's infection by March 2009.

33.     Although Giambalvo has the burden to show that the USP Hazelton medical staff's breach was a proximate cause to his injuries, he "is not required to demonstrate that such breach was the *sole* proximate cause of the injury." *Stewart v. George*, 607 S.E.2d 394, 398 (W. Va. 2004) (emphasis in original).

34.     Based on the evidence and testimony provided, this Court finds that the USP Hazelton medical staff's treatment of Giambalvo fell below the standard of care, and, consequently, Giambalvo suffered degenerative and permanent injuries to his right foot.

## 3. The Actions by the USP Hazelton Medical Staff Were Not a Proximate Cause of Giambalvo's CRPS

35.     In 2010, while at FMC Butner, an orthopaedic specialist concluded Giambalvo did not have CRPS, but instead an interdigital neuroma.

36.     At trial, Dr. Argoff viewed photos taken of Giambalvo's foot in 2010. Dr. Argoff testified that these photos did not show the foot of someone suffering from CRPS.

37.     With respect to whether Giambalvo suffered from CRPS in 2010, this Court finds the testimony of Dr. Argoff to be more useful than that of any other testifying physician.

38.     In August 2012, Giambalvo self-removed the big toenail from his right foot.

39.     By Fall 2012, Giambalvo began experiencing increased pain and swelling in his right foot, ankle, and leg.

40.     In December 2012, Giambalvo was released from BOP custody.

41.     Dr. Argoff testified that photographs taken of Giambalvo's foot in 2010 compared to photographs taken from November 2012 to February 2013 were remarkably different.

42.     Further, Dr. Hall, Giambalvo's treating physician at FMC Butner, testified at trial that Giambalvo's foot, ankle, or leg never appeared at FMC Butner as they did in the photographs taken in 2012-13.

43.     At trial, Dr. Argoff explained that there is no evidence until 2012 that Giambalvo was suffering from CRPS - four years after the initial toenail procedure by Azumah at USP Hazelton.

44.     Dr. Argoff testified that CRPS, at the latest, can develop six to twelve months after a traumatic event.

45.     In March 2014, Giambalvo again self-removed the big toenail on his right foot.

46.     Dr. Long examined Giambalvo on June 16, 2014. Confirming a previous report, Dr. Long concluded that Giambalvo currently suffers from CRPS.

47.     With respect to whether Giambalvo currently suffers from CRPS, this Court finds the testimony of Dr. Long to be credible and useful.

48.     "The phrase 'a proximate cause' in W.Va.Code, 55-7B-3 must be understood to be that cause which in actual sequence, unbroken by any independent cause, produced the wrong complained of, without which the wrong would not have occurred." *Mays*, 579 S.E.2d at 565 (some internal quotations omitted).

49.     "The proximate cause of an injury is the last negligent act contributing to the injury and without which the injury would not have occurred." *Hartley v. Crede*, 82 S.E.2d 672, 679 (W. Va. 1954), *overruled on other grounds by State v. Kopa*, 311 S.E.2d 412 (W.Va. 1983)).

50.     When Giambalvo was discharged from BOP custody, he suffered from degenerative and permanent injuries to his right foot, however, he did not suffer from CRPS.

51.     The photos taken of Giambalvo's foot that show possible symptoms of CRPS were taken five years after Giambalvo's initial toenail procedure.

52.     Dr. Argoff testified that CRPS, at the latest, would develop six to twelve months after a traumatic event. Based on the expert testimony of Dr. Argoff, this Court finds that Giambalvo's CRPS could not have developed from any action taken by USP Hazelton medical staff in 2007-08.

53.     Therefore, based on the evidence and testimony provided, this Court finds that Giambalvo has not overcome his burden to show that the negligent actions of the USP Hazelton medical staff were a proximate cause of his CRPS.

54.     In summary, the BOP's actions, or lack of action, were the proximate cause of Plaintiff's degenerative and permanent injuries to his right foot exemplified by the interdigital neuroma in the third web space of his right foot. However, the BOP's actions, or lack of action, were not the proximate cause of Plaintiff's CRPS.

**4. Damages**

55.     For the reasons stated above, Plaintiff prevails on both Counts I and III.

56.     By order dated January 26, 2015, this Court permitted Plaintiff to increase his administrative claim to $5,000,000 because information submitted by Plaintiff fell into 28 U.S.C. § 2675(b)'s exception as "newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency." ECF No. 159. In the same order, this Court also found that the MPLA's statutory cap applied in this case. *Id.*

57.     "The trial court, as a fact-finder, possesses considerable discretion in fixing damages, and its decision will be upheld absent clear error." *Little Beaver Enterprises v. Humphreys Railways, Inc.*, 719 F.2d 75, 79 (4th Cir. 1983).

58.    "[T]he damages amount need be only a 'just and reasonable estimate based on relevant data,' and need not be 'proven with mathematical precision.'" *2300 Pennsylvania Ave., LLC v. Harkins Builders, Inc.*, 513 F. App'x 273, 277 (4th Cir. 2013) (quoting *Affordable Elegance Travel, Inc. v. Worldspan, L.P.*, 774 A.2d 320, 329 (D.C.2001)).

59.    Due to the lack of a significant employment history and plaintiff's criminal history, this Court finds that any award for lost wages would be speculative. Accordingly, no award for lost wages will be made.

60.    With respect to Giambalvo's economic damages, this Court finds Forests's testimony to be more credible, persuasive, and useful than that of any other witness.

61.    Forests's estimates of economic damages discuss Giambalvo's complete medical costs with CRPS. Yet, Giambalvo has not proved that the BOP's negligent actions were a proximate cause of his CRPS. However, Giambalvo has proved that the BOP's negligent actions were a proximate cause of degenerative and permanent injuries to his right foot exemplified by the interdigital neuroma in the third web space of his right foot.

62.    Therefore, this Court must find the reasonable medical expenses related to Plaintiff's degenerative and permanent injuries to his right foot exemplified by the interdigital neuroma in the third web space of his right, but not his CRPS. Accordingly, this Court will award economic damages in the amount of two hundred and fifty thousand dollars ($250,000.00) as the cost of a life care plan as compensation for the degenerative and permanent injuries to Giambalvo's right foot.

63.    With regard to noneconomic damages, such as pain and suffering and the loss of ability to enjoy life, the Supreme Court of Appeals of West Virginia holds:

> It is well settled that an injured plaintiff may recover damages for pain and suffering caused by the negligence of the defendant. *Keiffer v. Queen*, 155 W.Va. 868, 189

S.E.2d 842 (1972). In addition, "[a] plaintiff may recover the cost of reasonable and
necessary future medical and hospital services and for future pain and suffering when
the evidence shows it is reasonably certain that such future expenses will be incurred
and are proximately related to the negligence of the defendant." Syllabus point 1,
*Ellard v. Harvey*, 159 W.Va. 871, 231 S.E.2d 339 (1976). See also *Keiffer v. Queen*,
*supra*; *Hall v. Groves*, 151 W.Va. 449, 153 S.E.2d 165 (1967); *Shreve v. Faris*, 144
W.Va. 819, 111 S.E.2d 169 (1959).

*Delong v. Kermit Lumber & Pressure Treating Co.*, 332 S.E.2d 256, 257 (W. Va. 1985).

64.    Usually, the MPLA caps noneconomic damages at $250,000. § 55-7B-8(a). However,

a plaintiff may recover up to $500,000 if noneconomic losses suffered by the plaintiff were for:

(1) Wrongful death; (2) permanent and substantial physical deformity, loss of use of
a limb or loss of a bodily organ system; or (3) permanent physical or mental
functional injury that permanently prevents the injured person from being able to
independently care for himself or herself and perform life sustaining activities.

§ 55-7B-8(b).

65.    Whether the MPLA's $500,000 cap applies is a determination for the finder of fact.

*See MacDonald v. City Hosp., Inc*., 715 S.E.2d 405, 422 (W. Va. 2011).

66.    As discussed earlier, this Court finds that the USP Hazelton medical staff's treatment

of Giambalvo fell below the standard of care, and, consequently, Giambalvo suffered degenerative

and permanent injuries to his right foot.

67.    Because of his injuries, he has lost the "use of a limb" and will be unable "to

independently care for himself or . . . perform life sustaining activities." § 55-7B-8(b).

68.    Therefore, plaintiff may be able to recover up to $500,000 of noneconomic damages.

In accordance with § 55-7B-8(c), this figure is adjusted to $635,073.37.[6]

---

[6] As required under § 55-7B-8(c), this figure is based on the consumer price index published by
the United States Department of Labor. *See CPI Inflation Calculator*, U.S. BUREAU OF LABOR
STATISTICS, http://www.bls.gov/data/inflation_calculator.htm (last visited March 3, 2015).

69.     This Court finds that Giambalvo has experienced pain and suffering from the time of his injury, and will continue having pain throughout the remainder of his life, expected to be 33.7 more years. Based on the Court's findings above, Plaintiff's noneconomic damages must be related to the degenerative and permanent injuries to Giambalvo's right foot, but not his CRPS. Accordingly, this Court will award noneconomic damages of fifty thousand dollars ($50,000.00).

**5. Attorney's Fees**

70.     Under the FTCA, "[n]o attorney shall charge, demand, receive, or collect for services rendered, fees in excess of 25 per centum of any judgment" in this case. 28 U.S.C. § 2678. The Equal Access to Justice Act, 28 U.S.C. § 2412, prohibits the award of fees and expenses in tort cases. § 2412(d)(1)(A).

## III. ORDER

On June 25, 2015, the United States Court of Appeals for the Fourth Circuit remanded this case "for the limited purpose of conducting further proceedings regarding the proper calculation of interest on the judgement." ECF No. 172. For the reasons appearing above, and after considering the positions by parties as to the calculation of interest, Plaintiff is granted a judgement of three hundred thousand dollars ($300,000.00) with interest to be calculated pursuant to 31 U.S.C. § 1304(b) and 28 U.S.C. § 2414.

The Clerk is hereby directed to transmit copies of this order to counsel of record herein.

**IT IS SO ORDERED**.

DATED: July 8, 2015                         /s/ *James E. Seibert*
                                            JAMES E. SEIBERT
                                            UNITED STATES MAGISTRATE JUDGE